MARTY ET AL. *v.* FIRST NATIONAL BANK OF BALTIMORE, TRUSTEE

(Two Appeals in One Record)

[No. 50, October Term, 1955.]

*Decided February 27, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*McKenny W. Egerton,* with whom were *Piper & Marbury* on the brief, for Mary Louise Marty.

*Edmund P. Dandrige, Jr.,* with whom were *Venable, Baetjer & Howard* on the brief, for J. Leonard Power.

*Roger B. Williams* and *Roger A. Clapp,* with whom were *Hershey, Donaldson, Williams & Stanley* on the brief, for the First National Bank of Baltimore, Trustee.

HAMMOND, J., delivered the opinion of the Court.

The trustee under the will of Alfred J. Tormey asked the court to instruct it as to whether trusts under which nieces and nephews of the testator are receiving income have or have not terminated. From a decree holding that the trusts still continue, a nephew and a niece appeal.

At the time of the execution of the will in 1938, Mr. Tormey was seventy-two years old, a widower and childless. He had three living sisters, Mary Rosalie Power, then seventy-five; Mary Elizabeth Devries, then seventy-four; and Mary Helen Plummer, then seventy-seven. Mrs. Power had one son, J. Leonard Power, then thirty-four, and then and now unmarried. Mrs. Devries had two children, a son and a daughter. The son, J. Roland Devries, was then forty-nine and had two sons; the younger was then six. The daughter, Mary Louise Marty, was then thirty-six, then and now married to Malcolm Marty, and then and now childless. Mrs. Plummer had three children. A son, Thomas C. Plummer, then forty-seven, had three children; the youngest was then fifteen. The second Plummer child was a daughter, Mary Elizabeth Leatherbury, then fifty, who had two daughters, the younger then being eight. The third child was Mary Eleanor Plummer, who had gone into a convent. All of the sisters and all of the nephews and nieces survived Mr. Tormey at his death in 1940. Mrs. Power died in 1947, Mrs. Devries in 1942, and Mrs. Plummer in 1941. No child or grandchild of any of the sisters was born between 1938 and the time of the institution of this proceeding in 1953.

The Tormey will contained some forty items. After disposing of his residence and giving thirty-three pecuniary legacies, including one to each of his sisters and each of his nephews and nieces by name, the residue of the estate—by far the greater part—is dealt with in Item XXXVI of the will. We are not concerned with the parts of that item which deal with the powers and duties of the trustees and their compensation. The part of Item XXXVI which must be interpreted gives the residue of the testator's estate in trust "to divide the same into three equal shares and hold and manage as a trust fund, one of said equal shares for the benefit of my sisters; Mary Rosalie Power, Mary Elizabeth Devries, and Mary Helen Plummer, for the uses and purposes hereinafter set forth." Except for a provision in the

Devries trust, giving Malcolm Marty for life the income his wife had received, if she predeceased him, and one in the Plummer trust dealing with the share of Mary Eleanor Plummer, who had gone into a convent, the provisions of all three trusts are substantially identical. Using the Devries trust as an example, the pertinent provisions are these:

"3. The income and principal of the trust fund for the benefit of Mary Elizabeth Devries shall be paid over and distributed as follows:

(a) The net income from said trust fund shall be paid in quarterly installments of equal amounts, or as nearly equal as practicable, to Mary Elizabeth Devries for and during her life.

(b) Upon the death of Mary Elizabeth Devries, the net income shall be paid in quarterly installments of equal amount, or as nearly equal as practicable, to the children of Mary Elizabeth Devries living at the time of each payment, share and share alike, for a period of twenty-one years after the death of the last surviving descendant of Mary Elizabeth Devries living at the time of my death, or until the youngest living grandchild of Mary Elizabeth Devries shall have attained the age of twenty-one years, whichever event shall first occur. But should any child of Mary Elizabeth Devries have died leaving descendants, the descendants of said child shall be entitled to receive a share equal to that which their parent would have received had that child of the said Mary Elizabeth Devries been alive at the time of payment. The descendants of any deceased child of Mary Elizabeth Devries shall take per stirpes and not per capita.

(c) From and after twenty-one years after the death of the last surviving descendant of Mary Elizabeth Devries living at the time of my death, or upon the youngest living grand-

child of Mary Elizabeth Devries attaining the age of twenty-one years, whichever event shall first occur, I hereby give the trust estate as then constituted, including accrued interest not matured, unto the children of Mary Elizabeth Devries then living. But should any child of Mary Elizabeth Devries have died before the distribution of the corpus of this trust leaving descendants, the descendants of said child shall be entitled to receive a share equal to that which their parent would have received had that child of the said Mary Elizabeth Devries been alive at the time of the distribution of the corpus of this trust. The descendants of any deceased child of Mary Elizabeth Devries shall take per stirpes and not per capita.

\* \* \*

(e) In the event, (1) that my sister Mary Elizabeth Devries shall die without leaving descendants surviving her, or (2) that all of the children of Mary Elizabeth Devries die before the time of distribution above provided without leaving descendants, or (3) there are none of said children or descendants living at the time provided for distribution, then the Trustees shall divide the trust estate as then constituted, including accrued interest not matured, into two equal parts and shall add one of said equal parts to the trust funds hereunder created for the benefit of Mary Rosalie Power and Mary Helen Plummer, respectively."

There is a provision that if, for stated reasons, or any other reason, there are no persons entitled to take at the time provided for distribution, or if any part of the income or corpus should revert to the estate of the testator, two named hospitals take the income or corpus, or both, that the sisters or their descendants otherwise would have taken.

The trustee instituted suit in 1953 and made parties all of the children and grandchildren of testator's sisters, as well as the hospitals. In the court below, J. Leonard Power asserted that the Power trust had ended, and Mrs. Marty made the same claim as to the Devries trust, concurred in by Mr. Marty. Other adult members of the Devries family took the position that the Devries trust had not ended. Appearances were entered for the members of the Plummer family but none took an affirmative stand. The trustee contended that the Power and Devries trusts had not terminated. The master and the chancellor agreed with the trustee.

Only Leonard Power and Mary Louise Marty have appealed. Mrs. Marty claims that since the youngest living grandchild of Mrs. Devries has attained the age of twenty-one, the Devries trust has terminated, while Mr. Power contends that since there is no grandchild of Mrs. Power under the age of twenty-one, the terminating condition of the will in this respect is satisfied and he is entitled to the principal of the Power trust.

The key to the case is what point of time did the testator intend to use to determine when income payments should cease and principal be distributed. In each of the trusts, this moment came about when either of two contingencies occurred, no matter which first happened. The moment was either, once the death of a sister had ended her life tenancy, twenty-one years after the death of her last surviving descendant living at the time of the death of the testator, or when the youngest living grandchild of that sister "shall have attained the age of twenty-one years", whichever first came about.

In seeking to find what the testator meant, we adhere to the rules and guides which the cases have established. Intention is primary and paramount. This is not the presumed but the expressed intention of the testator. What must be sought is not what the testator meant as distinguished from what his words express, but "* * * simply what is the true meaning of his words; not merely what *he* meant, but what *his words* mean." *Miller, Con-*

*struction of Wills*, Sec. 10. *Schapiro v. Howard*, 113 Md. 360. What the words express is to be interpreted according to their plain meaning and import. *Stein v. Safe Deposit & Trust Co.*, 127 Md. 206. This expressed intention of a testator must be gathered from the language of the entire will, particularly from the clause in dispute, read in the light of the surrounding circumstances at the time the will was made. *Chism v. Reese*, 190 Md. 311; *West v. Sellmayer*, 150 Md. 478; *Jones v. Holloway*, 183 Md. 40; *Robinson v. Mercantile Trust Co.*, 180 Md. 336; *Hutton v. Safe Deposit & Trust Co.*, 150 Md. 539, 554. The law does not contemplate, nor may courts assume, from the age of the parties, the impossibility of their having children, but the probability may be considered in determining what the testator may have expressed by his words when he made his will. *In re Ricard's Trust Estate*, 97 Md. 608, 609; *Williams v. Armiger*, 129 Md. 222, 234; *In re Estate of Snyder*, 195 Md. 81, 86; *Chism v. Reese*, 190 Md. 311, *supra*.

Four alternative constructions have been suggested as to the true meaning of the critical phrase "upon the youngest living grandchild * * * attaining the age of twenty-one years." Is the youngest living grandchild of a sister to be determined from among her grandchildren:

(A) who were living at the time of the testator's death in 1940, or

(B) who were living at the time of her death in 1942, or

(C) who may be in being as of any specific date, or

(D) who may have been born or who may be born at any time, past, present, or future?

The first two alternatives may readily be eliminated. If either of them had been intended, the cut-off clause protecting against the rule against perpetuities would have been wholly unnecessary. In addition, the absence of any provision specifying the time at which the youngest living grandchild must be alive, is in striking, and we think, significant, contrast to the cut-off clause, which

in terms speaks of the last surviving descendant living at the time of the testator's death. There remain alternative (C) and alternative (D). If the testator meant either, the clause protecting against violation of the rule against perpetuities was essential from a legal and formal point of view. This is because of the rule of law to which we have referred, under which it is considered always possible that a living person may have a child. Many a will has been criticized as inartificial, but even a casual reading of the Tormey will makes it apparent that in concept and execution, it is highly artificial. Its language requires the inference that the testator dealt with the possibility in law that a sister might have a child after his death who in turn might have a child after the death of the sister, and that such a grandchild of the sister might not become twenty-one until more than twenty-one years after the death of the last descendant of that sister who was living at the testator's death. If such an eventuality occurred, the rule against perpetuities would be violated absent the cut-off clause. *Miller, Construction of Wills,* Sec. 328 (n. 12, p. 936) ; *Gray, Rule Against Perpetuities,* Sec. 110.1, p. 98 (4th Ed., 1942).

In what fashion did the testator deal with this possibility? We think not in such fashion that the results which are produced by alternative (C) can be deemed to have been his intention. If we put ourselves, in the traditional place, behind the armchair of the testator as he contemplated the disposition he wished to be made to the objects of his bounty, we would be standing behind a man who was not unaware of the problems and methods of early, as contrasted with late, vesting of trust estates and one upon whom had been urged the desirability of continuing property in trust. The opinion in *Safe Deposit & Trust Co. v. Bouse,* 181 Md. 351, 353, 354, reveals that Mr. Tormey's mother, who died in 1922, left him one-fourth of her estate for his life, with remainder to his children, if any, living at his death, and if not, with remainder to his sisters, Mrs. Power, Mrs. Devries and Mrs. Plummer, on condition that within

six months of her death he make a deed of trust providing for the similar devolution of all property coming to him outright from a trust created by his grandfather, of which his mother was a life tenant. A similar condition was imposed on Mrs. Plummer, and both she and Mr. Tormey made the deeds of trust required by their mother's will. Was this somewhat experienced testator foreseeing and providing against the actual probability that his sister, Mrs. Power, then seventy-four, would have a child other than her only child, Leonard Power, then thirty-six? We think not. Yet, his provision is that upon the death of Mary Rosalie Power, "the net income shall be paid * * * to the children of Mary Rosalie Power living at the time of each payment, share and share alike, for a period of twenty-one years after the death of the last surviving descendant of Mary Rosalie Power living at the time of my death, * * *." It continues: "But should any child of Mary Rosalie Power have died leaving descendants, the descendants of said child shall be entitled to receive a share equal to that which their parents would have received * * *." It concludes: "The descendants of any deceased child of Mary Rosalie Power shall take per stirpes and not per capita." If the language of the will had not been used in an artificial design to continue the trusts as long as possible, it can only be supposed that Mr. Tormey, for example, would have left the income to Mrs. Power for life (as he did) and then by name to Leonard Power outright or for life, or until his youngest child at any given time became twenty-one. The same can be said as to the Devries and Plummer trusts, in which the sisters were each over seventy and their children adult. As had been noted, Mr. Tormey made a pecuniary bequest to each of his nephews and nieces by name. At the date of the will in 1938, the youngest Devries grandson was six years old and at the time of the testator's death, was eight. The youngest Plummer grandchild was nine at the date of the will and eleven at the testator's death. We cannot bring ourselves to believe that the testator set up the elaborate

trusts that he did, knowing that, in all likelihood, two of them would last but ten or fifteen years at most, or that if this had been intended, he would have been so preoccupied with the rule against perpetuities. If the early termination of the trusts had been his expectation and intention, the will could have been expressed in much more simple, direct and personal terms. It is urged that Mr. Tormey thought of the descendants of each sister as a separate family group and that, whatever his reason, he wanted distribution of principal made to all nephews and nieces in the group, no matter whose grandchild was the last to become twenty-one. If he intended the trusts to continue as long as legally possible, so that nephews and nieces would never take, obviously he intended distribution to be made to all their descendants living at termination. However, no reason has been suggested, nor has any occurred to us why, if nephews and nieces were to take principal, a family group should have been intended to be the descendants of a sister. We cannot ascribe to Mr. Tormey from anything he said in the will the intention to measure the right of one child of a sister to take principal by the moment the youngest child of another child of that sister became twenty-one. If the testator had provided that the fund of principal in which a nephew or niece had an interest should be distributed when the child of that particular nephew or niece became twenty-one, there might have been some force in the argument. Mrs. Marty was childless, and from the proviso that if she predeceased him, her husband should receive the income for life that she had been receiving, there is at least a hint that Mr. Tormey did not expect her to have children or ever to receive principal. What possible purpose could be served by, or what logic support a supposed intention to give Mrs. Marty her share outright, not at her mother's death but merely because the youngest to do so of her brother's children living at any given time became twenty-one? In such case, although childless, she would take outright, while Leonard Power, also childless, would not. The

carefully drawn provision of each trust, setting up cross-remainders to the other trusts if there are no nephews or nieces, or their descendants at the time of distribution, opposes such a conclusion. We find that alternative (C) was not intended.

Confronted with alternative (D) as the true intention of their uncle's will, the appellants say that this cannot be because such a construction would make the words of the will meaningless. It is said that the words "child" and "children" must be given their usual meaning of immediate descendants and may not be taken to include grandchildren or more remote descendants. Upon this premise it is urged that the distribution of principal, directed to be made at the termination of the trust, is primarily "unto the children" of the sisters and that gifts to grandchildren of the sisters are secondary and substitutionary only, and that the testator cannot be regarded as having given primary and original gifts that he knew would never materialize. It is argued that Mr. Tormey must have known that descendants of a sister included children of that sister and there should not be attributed to him an intent to postpone distribution of principal until twenty-one years after the death of the last surviving child or other descendants of a sister living at his death when this would mean that at no time and under no circumstances would distribution ever be made to a child.

We agree that the words "child" and "children" were intended by Mr. Tormey to mean, and do mean, what they normally mean—immediate and not more remote descendants. *Bowman v. Weer,* 204 Md. 344; *Sabit v. Safe Deposit & Trust Co.,* 184 Md. 24, 37; *Miller, Construction of Wills,* Sec. 85. We think, however, that from this premise do not follow the conclusions sought by the appellants. We do not regard the Tormey will as one with that before the perhaps not wholly apocryphal English chancellor who said: "This will has no meaning but it is my plain duty to give it one." We have noted that the testator did not use the words child and children in a

personal sense or as necessarily denoting children living when the will was made. He wrote of the children of Mrs. Power, of a child of hers dying before distribution, while another child or other children then survived, yet Leonard Power was her only child. The testator well knew that, as a practical matter, there would never be another child. He knew this to be true also of his other sisters, Mrs. Devries and Mrs. Plummer. Why then did he direct distribution to the children of his sisters? We think that the answer is that he wanted the trusts to last as long as the law allowed. As we read it, the language of the will as to duration of the trusts and distribution of principal, was chosen with deliberate care to insure that the testator's sisters, and nephews and nieces, and great-nephews and great-nieces received income, and only income, as long as possible. The words used, given their plain meaning and import, not only accomplished such purpose but also guarded against the pitfalls of the perpetuities rule possible in the eyes of the law, although as a practical matter, highly unlikely to occur. The words "until the youngest living grandchild shall have attained the age of twenty-one years", read literally and according to their ordinary meaning and import, comprehend all possible grandchildren of the person mentioned, not those in being at any particular time. Courts have so held. *In re Van Wyck's Estate* (Calif.), 196 P. 50; *In re New Rochelle Trust Co.*, 50 N. Y. S. 2d 602. The possibility in law that a child might be born to a sister after Mr. Tormey's death who, in turn, would have a child who became twenty-one at a time more than twenty-one years after the death of the last to die of all the descendants of that sister who was living at his death, presented two problems that had to be dealt with in the elaborate and artificial plan of the will. First, this possibility would have violated the rule against perpetuities and, therefore, the testator used the cut-off clause and provided that the trusts would terminate twenty-one years after the death of the last descendant living at his death, if that happened before the youngest living grandchild became twenty-one.

If the conditions of the cut-off clause occurred and there was then living a nephew or niece born after Mr. Tormey's death, he or she would take, so that the direction that a child if living take principal is not meaningless but is sensible and necessary in the artificial plan and execution of the will. Too, having been necessarily so used, the words child and children served as the means of identification of those who were intended actually to take. We think the testator used the word "descendant" and words "child" or "children" intentionally and meaningfully, and distinguished between them. Cf. *Elliott v. Van Ess*, 147 Md. 407.

It is our view that the testator was not only aware that the nephews and nieces known to him would not receive principal, but that this was the fundamental purpose he had in mind. He chose to accomplish it by a token acknowledgment of theoretical legal possibilities while guarding against violation of the rule against perpetuities in the process. His preoccupation with the rule and his insistence upon insuring the maximum duration of the trusts consistent with it are too apparent, as we read the will, to be frustrated by failing to give a literal, normal and ordinary meaning to the words he wrote, even though they took into account a contingency entirely possible legally, although highly remote practically.

We think that the master, and the chancellor, who adopted his views, correctly interpreted the Tormey will and that the decree appealed from must be affirmed. It was entirely appropriate for the trustee to seek the aid of the court in construing the will and in administering the trusts. Costs below should be paid from the corpus of all the trusts, and the costs of this appeal should be paid from the corpus of the Power and the Devries trusts.

*Decree affirmed; costs to be paid equally from the corpus of the Power and Devries trusts.*